UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IRIS PAGE,

       Plaintiff,                              Civil Action No. 11-CV-12254

vs.                                      HON. BERNARD A. FRIEDMAN

MICHAEL J. ASTRUE,

       Defendant.
_____/

**OPINION AND ORDER REJECTING THE MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION, DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT, AND GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

        This Social Security disability matter is presently before the court on cross motions for summary judgment. Magistrate Judge Mona K. Majzoub has submitted a Report and Recommendation ("R&R") in which she recommends that plaintiff's motion be denied and that defendant's motion be granted. Plaintiff has submitted timely objections to the R&R and defendant has responded to plaintiff's objections. Having reviewed *de novo* those portions of the R&R to which objections were filed, and having reviewed the entire record on its own motion, the court shall reject the R&R and remand the matter for further proceedings.

        Plaintiff claims to be disabled as of December 6, 2007, due to various mental and physical impairments. The medical records indicate that plaintiff has pain in her ankles, knees, hands, right elbow and back, a seizure disorder, headaches, depression, anxiety and post-traumatic stress disorder ("PTSD"). The ALJ found that plaintiff "has the following severe impairments: seizure disorder, arthritis in left and right ankles, residuals of fracture to metacarpal of right hand, residuals of back injury with compression fracture at T8, chronic alcoholism, anxiety, and

depression," but that she nonetheless can perform simple, unskilled, sedentary work that does not involve "repetitive handling with the right (dominant) hand" or "work at unprotected heights, around dangerous moving machinery, open flames, or bodies of water . . . [or] commercial driving" (R. 56, 58-59). The ALJ found that plaintiff cannot perform any of her past work, including that of telephone operator (R. 63), but that based on testimony from a vocational expert ("VE") hundreds of thousands of jobs exist which plaintiff could perform, e.g., as office clerk, hand packer and hand sorter (R. 64).[1] The Appeals Council denied plaintiff's request for review, thereby leaving the ALJ's decision as the commissioner's final decision (R. 1).

Plaintiff's first objection is that the magistrate judge did not find error in the ALJ's failure to include plaintiff's closed head injury and PTSD among her "severe impairments." Further, plaintiff argues that the ALJ neglected to consider the degree to which these impairments contribute to her memory problems.

The court agrees with the magistrate judge that the ALJ did not commit error simply by failing to include any particular impairment(s) among those he considered to be severe. As the magistrate judge noted, citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240 (6th Cir. 1987), at step two of the disability analysis the ALJ need not list all of plaintiff's impairments or determine which are severe because "upon determining that a claimant has one severe impairment, the Secretary must continue with the remaining steps in his disability evaluation . . . ." *Id.* at 244.

---

[1] In his written decision the ALJ stated that the VE testified to the existence of 417,000 office clerk jobs, 113,000 hand packer jobs and 118,000 hand sorter jobs in the national economy (R. 64). This is incorrect. According to the hearing transcript, the VE testified that "there's a large body of unskilled sedentary occupations, such as an office clerk, in which there are reported 17,000 positions; that of a hand packer, 113,000; or a hand sorter, 98,000" (R. 45-46).

Nonetheless, the ALJ must consider all of plaintiff's mental and physical impairments, including those not mentioned at step two, in assessing plaintiff's residual functional capacity ("RFC") and in determining whether work within plaintiff's RFC exists in significant numbers.  In the present case, it does not appear that the ALJ gave much, if any, consideration to the effect of plaintiff's closed head injury, PTSD, or her difficulties with memory at these steps of his analysis.

The ALJ mentioned plaintiff's closed head injury[2] (R. 60, 61), but he appears to have dismissed its significance on the grounds that in April 2009 "claimant's closed head injury had improved over the previous year, as an MRI of the skull and brain showed a normal brain, a resolved subgaleal effusion, and significantly improved scalp swelling" (R. 61, citing Dr. Rentz's report at R. 292).  Even assuming plaintiff's closed head injury improved by April 2009 to the point where it was medically insignificant, the ALJ should have considered and discussed the significance of this injury, in combination with plaintiff's other impairments, as it relates to her RFC during the 12-month period between April 2008 and April 2009.

Moreover, the mere fact that the April 2009 MRI showed "a normal brain" and other improvements does not support the ALJ's apparent finding that the closed head injury had medically resolved and is therefore irrelevant to the disability analysis.  Plaintiff testified that she suffers from severe headaches five or six times per week and that when they occur she must take Percocet, lie

---

[2] This injury occurred in April 2008 when plaintiff was attacked by her ex-husband and beaten with a baseball bat or hammer (R. 271).  Plaintiff "was hit in the head several times" (R. 272) and "was beaten unconscious" (R. 278).  Her right hand was also fractured in this attack (R. 278).  An MRI of plaintiff's brain in May 2008 showed "[d]eformity of skin and subcutaneous soft tissues . . . in left parietal region" but "no acute intracranial abnormality" (R. 277).  Plaintiff's boyfriend/husband was killed in this attack (R. 278).

down and have "complete quietness" (R. 42). Dr. Rentz indicated in April 2009 that

> [s]he has headaches. Her scalp has palpable elevations which would be consistent with the initial injury, and of course the MRI of her head showed subgaleal effusions and soft tissue injuries as a result of the hammer blows. . . . She has bald spots in the areas of the injury also. She has sensitivity to touch over the left side of the scalp, and she has neck pain. She takes Percocet twice a day and she does get pain relief from that.

(R. 292.) The ALJ neglected to discuss plaintiff's headaches directly, and he made only two oblique references to them in his decision. In the first, the ALJ asserted that plaintiff claims to suffer headaches as one of her medication side-effects and he then dismissed them, along with her complaints about her ankle and knee problems and her grand mal seizures, with the boilerplate statement that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. 59). While plaintiff did mention headaches as a side-effect of her medications (Tr. 33),[3] she clearly attributed her headaches primarily to the head injuries she sustained in the April 2008 attack by her ex-husband (R. 41-43).

In his second reference to plaintiff headaches, the ALJ appears to have equated them with plaintiff's neck pain and then dismissed the headaches, without saying so directly, along with the neck pain based on medical evidence showing a normal range of motion and a lack of tenderness in plaintiff's cervical spine (R. 61). Even assuming plaintiff's neck and cervical spine are normal,

_____

[3] In her disability report, plaintiff listed "sleepiness" and "makes me sick to stomach" as the side-effects to some of her medications (Tr. 181). As is discussed below, the ALJ neglected to make any findings regarding the severity of these side-effects, particularly sleepiness, or to include them in his hypothetical question to the VE. This must be corrected on remand.

her headaches cannot be so easily dismissed.  The fact remains that plaintiff was beaten in the head with a bat or hammer until unconscious.  The ALJ should have made specific findings as to the severity and frequency of plaintiff's headaches and included them in his RFC determination and in his hypothetical question(s) to the VE.

As plaintiff correctly notes, the ALJ also neglected to consider plaintiff's PTSD in determining her RFC and in identifying jobs she can perform.  In fact, the ALJ did not mention plaintiff's PTSD at all in his decision, although Dr. Rentz indicated in April 2009 that plaintiff "has some post-traumatic stress disorder secondary to both head injury and the death of her boyfriend and subsequent death of a daughter" (R. 292).  On remand, the ALJ is directed to consider evidence of this impairment, including Dr. Mlak's June 10, 2010, report (Ex. 30F, R. 750-55) which plaintiff submitted after the ALJ issued his decision.

Plaintiff also correctly notes that the ALJ failed to properly analyze her memory problems.  In his decision, the ALJ stated that plaintiff's "allegedly impaired memory and concentration is supported by the medical evidence, and the impairment is specifically considered in the residual functional capacity determination set forth herein" (R. 58).  Yet the ALJ's only subsequent mention of this impairment is his suggestion at R. 61 that it is adequately accommodated by the medical consultant who, in evaluating plaintiff's mental RFC, found plaintiff capable of performing  "simple unskilled" work (R. 660).

The error here is threefold.  First, the mental RFC assessment, dated March 16, 2008, is too old to be fully probative.  The ALJ issued his decision nearly two years later, on January 13, 2010.  In the interim, plaintiff suffered the April 2008 closed head injury and in July 2008 her treating physician noted "memory loss" and "poor memory" (Tr. 282, 285).  Second, and relatedly,

5

the medical consultant's only reference to evidence regarding plaintiff's memory is a consultative examination dated February 27, 2008 (R. 678), which also predated the April 2008 closed head injury.[4] Third, the ALJ did not include any findings regarding plaintiff's memory problems in his hypothetical question to the VE, but simply purported to accommodate this impairment by restricting plaintiff to "simple, unskilled, sedentary work" (R. 45).

In summary, the court shall sustain plaintiff's first objection on the grounds that the ALJ did not properly consider plaintiff's closed head injury (including her headaches), her PTSD, or her difficulties with memory in evaluating her RFC, and on the ground he failed to incorporate any such findings as to these impairments in his hypothetical question to the VE. All of these issues must be addressed on remand.

Plaintiff's second objection is that the magistrate judge erred in upholding the ALJ's determination that plaintiff does not meet Listings 1.02, 12.04 and 12.06.[5] As to the first of these,

_____

[4] This is a reference to Dr. Kelwala's February 27, 2008, report (R. 648-51). Dr. Kelwala's only mention of plaintiff's memory states:

> Memory: She could repeat five numbers forward and could recall three numbers backwards. She could recall three out of three objects after three minutes. She could name past Presidents correctly. She could name five large cities.

(R. 650.) A similar test conducted by Dr. Mlak in June 2010 had much poorer results (R. 753).

[5] Listing 1.02 states:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

6

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; . . .

Listing 1.00B2b, in turn, states:

What we mean by inability to ambulate effectively.

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Listing 12.04 states:

12.04 Affective disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the

7

requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful

8

consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.06 states:

9

12.06 Anxiety-related disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or

b. Autonomic hyperactivity; or

c. Apprehensive expectation; or

d. Vigilance and scanning; or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

10

the ALJ found that plaintiff does not meet Listing 1.02 because "[t]he medical evidence of record shows that it was clinically necessary for the claimant to use a cane for effective ambulation, but the use of a single cane does not limit the functioning of both upper extremities" (R. 57).  Plaintiff objects on the grounds that she used crutches and was prescribed a power wheelchair.  However, as the magistrate judge notes, the record does not establish whether plaintiff used crutches or a power wheelchair for at least 12 months.  At the hearing, which took place on December 4, 2009, plaintiff indicated that she had been "walking and weight-bearing . . . until at least April 20 of 2009" (R. 17).  Plaintiff's objection as to Listing 1.02 is therefore denied.

However, on remand the ALJ must consider whether plaintiff has, in the interim, met the 12-month durational requirement.  The ALJ noted at the December 4, 2009, hearing that plaintiff was using a walker (R. 17).  Dr. Mlak noted in June 2010 that plaintiff "[a]mbulates with walker" (R. 750).  If plaintiff used a walker (or power wheelchair) for any 12-month period, the factual basis for the ALJ's decision as to Listing 1.02 would be eliminated.

The ALJ found that plaintiff does not meet Listings 12.04 or 12.06 because she does

---

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

11

not satisfy the "B" or "C" criteria of either listed impairment.  The "B" criteria of both listings are the same, while the "C" criteria are different.  To satisfy these listings, plaintiff must meet two of the four "B" criteria or the "C" criteria – in addition to the "A" criteria, which the ALJ did not discuss.  The magistrate judge upheld the ALJ's analysis.  In her objections, plaintiff argues that she satisfies B1, B2 and B3 of both listings as well as the "C" criterion of 12.06.

The B1, B2 and B3 criteria require, respectively, a "marked" restriction of daily living activities and "marked" difficulties in social functioning and in concentration, persistence or pace.  The ALJ found only "mild" restrictions and difficulties:

> In activities of daily living, the claimant has mild restriction.  The claimant described somewhat limited activities of daily living, indicating that she needed assistance performing personal care, did not cook or perform household chores, did not drive, and shopped only once a month (Ex. 6E).  These limitations are primarily attributable to her physical, as opposed to mental impairments.  In social functioning, the claimant has mild difficulties.  The claimant indicated that she did not socialize with anyone outside her family, but admitted to psychiatric consultative examiner Dr. Surendra Kelwala that she got along with neighbors, friends and family (Ex. 15F).  With regard to concentration, persistence or pace, the claimant has moderate difficulties.   The claimant alleged difficulty concentrating when she submitted a function report in January 2008 (Ex. 6E), but testified at hearing that she could focus on a television program for one to two hours and could focus on a book for 30 minutes. . . .

> *   *   *

> Regarding the claimant's anxiety and depression, psychiatric consultative examiner Dr. Surendra Kelwala observed in March 2008 that the claimant had symptoms of moderately severe depression secondary to her physical condition (Ex. 15F).  The claimant was noted to have no history of psychiatric treatment, but was prescribed Xanax and Paxil by her primary care physician.  Her social skills were not compromised by her mental state, as she reported getting along with neighbors, family and friends.   A mental status examination was largely normal, and Dr. Kelwala issued a global

12

assessment of functioning (GAF) score of 55, indicating only moderate symptoms or functional limitations. Based on this examination and the available medical evidence, Michigan [DDS] medical consultant Dr. Rose Moten-Solomon assessed the claimant's mental residual functional capacity (Ex. 20F). She found that the claimant had moderate limitations regarding detailed instructions and maintaining attention and concentration for extended periods. This limitation is consistent with the manifest weight of the medical evidence, including more recent evidence not available to Dr. Moten-Solomon, and is also congruous with the claimant's allegations regarding impaired memory and concentration. Dr. Moten-Solomon found that the claimant retained sufficient mental capacity to engage in simple, unskilled work activity.

(R. 58, 62.)

The ALJ's findings regarding plaintiff's activities of daily living ("ADLs") and her social functioning are not supported by substantial evidence. The ALJ's finding that plaintiff's ADLs are only mildly restricted is based, it appears, on plaintiff's statements in her Function Report (Ex. 6E, R. 224-231) and the ALJ's determination that the restrictions in plaintiff's ADLs are due primarily to physical, not mental, reasons. Certainly, plaintiff did not describe "mild" restrictions in her ADLs in her Function Report. She indicated that she does nothing all day except "get up take bath get dress eat watch TV"; that she can do nothing that she could do before; that she needs help dressing and showering and sometimes needs help using the toilet; that she cannot cook or drive; that she does no household chores; that she shops for food "very rarely maybe once a month"; that she "use to be very independent and sociable" but now "[r]eally doesn't do anything" except watch TV; that she does not spend time with others except to go to the doctor or to visit her mother across the street; that she is "not active at all"; that she "[d]oesn't really have interest in anything"; and that she "like[s] to stay in room" (R. 224-30). The ALJ's determination, based on this exhibit, that "[t]he

13

claimant described somewhat limited activities of daily living," (R. 58) is incomprehensible.[6]

The ALJ determination that plaintiff's "limitations are primarily attributable to her physical, as opposed to mental, impairments" (R. 58) is based, apparently, on Dr. Kelwala's Axis 1 diagnosis in February 2008 that plaintiff has "[s]econdary depression, moderately severe, due to multiple medical problems. Panic attacks" (R. 650). The ALJ's implication, while not stated directly, appears to be that plaintiff is inactive because of her physical problems, not because she is depressed and anxious. This line of reasoning is not supported by the cited report. Dr. Kelwala indicated that plaintiff's depression is caused by her multiple physical problems, not that her lack of activity is unrelated to her depression.

Regarding the B2 criterion, social functioning, the ALJ found that plaintiff "has mild difficulties" because she "admitted to . . . Dr. Surendra Kelwala that she got along with neighbors, friends and family" (R. 58). This finding is not supported by substantial evidence. The entirety of Dr. Kelwala's comments on plaintiff's social functioning are as follows:

> Social Functioning: She said she does get along with family members because she mostly stays to herself. She got along with neighbours, friends, coworkers, and employers. She related well with us.

(R. 649.) The second sentence, to which the ALJ attached controlling significance, is written in the past tense. By the time of Dr. Kelwala's examination in February 2008, plaintiff had not had any

---

[6] Plaintiff's daughter, in her January 2008 Function Report likewise indicated that plaintiff does nothing but lie in bed or sit in a chair; that she needs help putting on her shoes; that she cannot stand long enough to shower; that she can comb her own hair but cannot wash it; that she sometimes needs help using the toilet; that she must be driven to the doctor or to the store; that she "use to be very independent and like to go around people" but now "she doesn't really do anything"; that she "barely ever" spends time with others; that she "is not active any more"; and that she "doesn't really like to go out of house" (R. 200-206).

14

coworkers or employers for more than a year, as her last job ended in December 2006 (*see* R. 176, 184). The fact that plaintiff got along with others *in the past* is no basis for concluding that she has only "mild difficulties" in this realm *currently*.[7] And the fact that plaintiff gets along with her family members "because she mostly stays to herself" further weakens the ALJ's finding that plaintiff has only "mild difficulties" with social functioning. The ALJ's finding that plaintiff has only "mild difficulties" with social functioning is also contradicted by his later citation to, and apparent acceptance of, a doctor's notation in August 2009 that plaintiff was experiencing "social isolation" (R. 62, citing Ex. 26F at 2, R. 723). That doctor also noted "minimal family support, not interacting [with] friends" (R. 723).

The ALJ's reliance on Dr. Kelwala's *February 2008* report as the evidentiary basis for finding that plaintiff has "mild restrictions" in her ADLs and "mild difficulties" in social functioning [8] is further undermined by the fact that two devastating events occurred in plaintiff's life *thereafter* – namely, the attack by her ex-husband in April 2008 (in which plaintiff was beaten

---

[7] The ALJ's statement that plaintiff's "social skills were not compromised by her mental state, as she reported getting along with neighbors, family and friends," again citing to Dr. Kelwala's report (R. 61), simply misconstrues the report. Plaintiff did not report "getting along" but that she "got along" with others.

[8] The ALJ also relied heavily on the mental RFC assessment by the DDS consultant, Dr. Rose Moten-Solomon, who concluded that plaintiff has "sufficient mental capacity to engage in simple, unskilled work activity" (R. 62, citing Ex. 20F [R. 661]). Dr. Moten-Solomon based her opinion on Dr. Kelwala's report and on Botsford Hospital notes dated January 10, 2008 (R. 678). Reliance on Dr. Moten-Solomon's March 2008 opinion was unreasonable because it, too, predated the hammer attack on plaintiff and the shooting death of plaintiff's daughter in April 2008 and September 2008, respectively. Further, Dr. Moten-Solomon mistakenly believed that plaintiff drives and cooks, and she made the contradictory notations that plaintiff both "manages stress by getting in the bed and avoiding people" and that she "gets along with people ok" (R. 659). Due to these errors, and the fact it predates the April 2008 hammer attack, this mental RFC assessment deserves no weight.

unconscious with a hammer and her boyfriend/husband was killed) and the shooting death of plaintiff's daughter in September 2008 (*see* R. 739).   Medical evidence from April 2008 to 2010, which was unavailable for Dr. Kelwala's consideration, indicates that plaintiff's mental condition worsened.   For example, in July 2008 plaintiff was diagnosed with closed head injury, memory loss, anxiety and depression (R. 282).   In October 2008 she was diagnosed with major depression (R. 739).   In April 2009 it was noted that plaintiff "has some post-traumatic stress disorder secondary to both head injury and the death of her boyfriend and subsequent death of a daughter (R. 292).   in June 2010 she was diagnosed with chronic PTSD consistent with depression and anxiety (R. 750, 754).   All of this evidence postdates the reports of Drs. Kelwala and Moten-Solomon, upon which the ALJ so heavily relied in assessing plaintiff's activities of daily living and social functioning.

            For these reasons, the ALJ's conclusion that plaintiff does not meet the B1 and B2 criteria is not supported by substantial evidence.   The ALJ's conclusion that plaintiff does not meet the B3 criterion fares no better.   The ALJ found that plaintiff has "moderate difficulties" with concentration, persistence or pace (R. 58).   In explaining this finding, the ALJ reasoned that plaintiff "testified at hearing that she could focus on a television program for one to two hours and could focus on a book for 30 minutes" and he then asserted that plaintiff's memory and concentration problems are accommodated in the mental RFC assessment.   *Id.*   The ALJ's characterization of plaintiff's hearing testimony is incomplete.   While plaintiff did indicate that she can read a "big-writing book" for "[m]aybe a half an hour" before her mind wanders, she also indicated that "I watch the same movie over and over, and it's like I miss this part of it, and I have to see it at least three or four times" (R. 36-37).   Further, the Social Security regulations state that "[o]n mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial

16

threes from 100." Listing 12.00C(3). In February 2008 plaintiff "could do serial 7's from 100" (R. 650), but in June 2010 "upon request for serial sevens the patient states that she cannot do that, because it will increase her headaches and she does not want to get stressed out" (Tr. 753). As for plaintiff's memory problems, the ALJ's failings regarding his assessment of those difficulties are summarized above. *See supra* at 5-6.

Finally, as to the "C" criterion of Listing 12.06, plaintiff argues that the magistrate judge erred in upholding the ALJ's finding that "[w]ith regard to 12.06(C), the record does not disclose a complete inability to function outside the home." The ALJ offers no discussion or citation to the record in support of this lone statement. On remand, the ALJ will explain his reasons for this conclusion so that the court may subject it to reasoned judicial review. The court notes, however, that the issue is whether plaintiff has a "complete inability to function independently outside the area of [her] home," which is a bit different from the ALJ's formulation. The court also notes the uncontradicted evidence that plaintiff does essentially nothing but stay at home and watch TV, does not socialize, and keeps to herself. The court has scoured the record and can find no indication that plaintiff can function independently outside the area of her home, but this will be for the ALJ to determine on remand.

On remand, the ALJ will consider all relevant evidence, including the new evidence plaintiff submitted after the last hearing (Ex. 30F and 31F [R. 750-63]) in determining whether plaintiff meets the criteria of any of the listed impairments, particularly 1.02, 12.04 and 12.06.

Plaintiff next objects to the magistrate judge's determination that the ALJ did not err in failing to give controlling weight to the opinion of plaintiff's treating physician, Dr. Steven Kohl. Dr. Kohl has been plaintiff's treating physician since June 2006 and he, along with other Botsford

17

Hospital physicians and consulting physicians, has seen plaintiff regularly since that time. *See* R. 298-318, 364-433, 722-30. Dr. Kohl has submitted two reports, dated July 11, 2008, and November 9, 2009, respectively, in which he indicates that plaintiff is unable to work. In the first report Dr. Kohl indicated diagnoses of closed head injury, right hand arthritis, anxiety disorder, depression, seizure disorder, memory loss, arthritis in plaintiff's ankles and knees, and a compression fracture in her spine, based on consulting, x-rays, physical examination and patient history (R. 282). Dr. Kohl indicated that plaintiff needs to lie down repeatedly throughout the day and that she cannot do full-time work involving reaching, handling or fingering. *Id.* He further indicated that plaintiff's ability to lift, carry, stand and walk are limited because of arthritis in her right wrist and ankles and the compression fracture in her thoracic spine; and that her ability to sit is affected by the compression fracture and her closed head injury (R. 283-84). Dr. Kohl stated that plaintiff "needs to frequently change position b/c of pain"; and that plaintiff's ability to use her right hand for such activities as handling, fingering, pushing and pulling is affected by "arthritis in [right] hand, as well as elbow . . . pain [with] use of [right] hand and elbow" (R. 283-84). Dr. Kohl concluded that plaintiff is "unable to sit or stand for any length of time" and that she has a head injury, as well as pain in her back, ankles, right elbow and right hand (R. 285).

    In his November 2009 report, Dr. Kohl diagnosed seizure disorder, hypertension, anxiety, depression, and arthritis based on x-rays, patient history and exams (R. 733). He indicated that it is not necessary for plaintiff to lie down repeatedly throughout the day, but that she does need "complete freedom to rest frequently without restriction" and that she cannot do full-time work involving reaching, handling or fingering. *Id.* Dr. Kohl indicated that plaintiff's ability to lift, carry, stand and walk are affected by her arthritis, closed head injury and bilateral ankle fractures (R. 734),

18

but that her ability to sit is not affected (R. 735). He indicated that plaintiff's ability to handle,

finger, push and pull are affected by her "multiple fractures and arthritis." *Id.* Dr. Kohl concluded

that plaintiff "has arthritis in both hands, [right] knee, both ankles as well as a seizure disorder,

close[d] head injury, depression and an anxiety disorder, preventing her from working" (R. 736).

The law regarding the role of treating physicians' opinions in Social Security

disability cases has been summarized as follows:

> The regulations provide specific guidance on the weight an
> ALJ should give to medical opinions. 20 C.F.R. § 404.1527(d)–(e).
> The medical opinion of a treating provider must be given controlling
> weight as long as it is "well-supported by medically acceptable
> clinical and laboratory diagnostic techniques and is not inconsistent
> with the other substantial evidence in [the claimaint's] case record...."
> 20 C.F.R. § 404.1527(d)(2). Where an ALJ chooses not to grant a
> treating physician's opinion controlling weight, the ALJ "must
> articulate 'good reasons'" for doing so. *Ibid.*; *White v. Comm'r of
> Soc. Sec.*, 572 F.3d 272, 286 (6th Cir.2009). And, generally, the
> opinion of an examining doctor is given more weight than a
> non-examining doctor. 20 C.F.R. § 404.1527(d)(1). Finally, while
> medical experts may opine on a claimant's limitations, "the ultimate
> decision of disability rests with the [ALJ]." *White*, 572 F.3d at 286
> (*quoting Walker v. Sec'y of Health and Human Servs.*, 980 F.2d 1066,
> 1070 (6th Cir.1992)); 20 C.F.R. § 404.1527(e)(1).

*Vorholt v. Comm'r of Soc. Sec.*, 409 F.App'x 883, 888 (6th Cir. 2011). In the present case, the ALJ

declined to follow Dr. Kohl's opinion that plaintiff cannot work because

> Dr. Kohl's opinion is not well-supported by medically acceptable
> clinical and laboratory diagnostic techniques, and amounts to an
> assertion of complete functional limitations based on what the
> majority of the medical evidence shows to be mild arthritis, a fairly
> controlled seizure disorder, and controlled depression and anxiety.
> As such, it cannot be accorded controlling weight. . . . [T]he doctor's
> opinion is not well-supported even by his own treatment notes, and
> is not fully consistent with the record as a whole.

(R. 62.)

The ALJ's decision to reject Dr. Kohl's opinion is not supported by substantial evidence. Specifically, substantial evidence does not support the ALJ's finding that Dr. Kohl's opinion is not well supported. Quite to the contrary, each of his diagnoses is amply supported by years to treatment, examination, x-rays, other tests, and consultations with other physicians, as documented in the 100 pages of medical records at R. 298-318, 364-433, 722-30. Nor does substantial evidence support the ALJ's finding that "the majority of the medical evidence" shows plaintiff's arthritis to be "mild," her seizure disorder to be "fairly controlled," or that her depression and anxiety are "controlled."

The ALJ cites no evidence to support his conclusion that plaintiff's arthritis is "mild." To the contrary, the ALJ noted that plaintiff has degenerative arthritis in her left knee, "significant arthritis" in her left ankle, and swelling of the right food "with underlying arthritis" (R. 60). And although the ALJ points to evidence that plaintiff's gait was stable on examination in March 2008 and April 2009, which might support a finding that the arthritis in her knee and ankles was mild, he nonetheless restricted plaintiff to sedentary work, which is inconsistent with his finding that the arthritis is mild.

Most significantly, the ALJ points to no evidence contradicting Dr. Kohl's opinion that the pain and arthritis in plaintiff's right hand, wrist and elbow prevent her from using that extremity to perform any handling, fingering, pushing or pulling on a full-time basis. This is critical because the ALJ's hypothetical question to the VE incorporated his finding that plaintiff can engage in "frequent handling" with her right hand (R. 45, 59). The medical evidence cited by the ALJ concerning plaintiff's right hand, which was fractured in the April 2008 hammer attack, indicated that the fracture had healed by April 2009 (R. 287-90) and that plaintiff had a limited range of

20

motion in her right elbow and right wrist on examination in March 2008 (R. 682).  This evidence does not support the ALJ's finding that plaintiff can use her right hand for "frequent handling,"[9] and it certainly does not suffice to override Dr. Kohl's opinion, who treated plaintiff repeatedly over a period of years, that handling, fingering, pushing and pulling are "unable to be done" because of plaintiff's "multiple fractures and arthritis" (R. 735).  In November 2009, Dr. Kohl went so far as to prescribe plaintiff a power wheelchair because she is "unable to use manual chair b/c of pain" due to arthritis in her right hand, right knee, right elbow and both ankles (R. 731), a fact not even acknowledged in the ALJ's decision.  At the hearing plaintiff testified that she has numbness and tremors in her right hand, that her right hand hurts when she opens and closes it, and that she cannot type because her right hand gets a "Charlie horse" cramp and goes numb (R. 26, 28, 43-44), testimony also not addressed by the ALJ.  Finally, evidence submitted after the hearing, which the ALJ must consider on remand,  indicates that Dr. Kohl referred plaintiff to an occupational therapist for bilateral hand pain (Tr. 760).  The therapist noted plaintiff's "painful loose fist" on the right, pain at 8 on a 10-point scale in both hands when in use, plaintiff's goal being "able to pick up items [without] dropping," and plaintiff's inability "to cut food, drops utensils [and] cups" (Tr. 760-61).  In short, substantial evidence does not support the ALJ's decision to disregard Dr. Kohl's opinion that plaintiff cannot use her right hand/wrist for work-related activities.

The ALJ's finding that plaintiff's seizure disorder is "fairly controlled" is similarly unsupported by substantial evidence.  Plaintiff testified that she has grand mal seizures three to four

---

[9] This physician, who examined plaintiff at the request of DDS, found that plaintiff can "get dressed, button clothing, tie shoelaces, pick up a coin, pencil and write," but he did not indicate whether she can do these activities frequently on a full-time basis.  He also indicated that plaintiff cannot "bend, stoop, carry, push and pull" (Tr. 683).

times per month and that she does not always seek medical attention after experiencing a seizure (R. 31-32). The ALJ concluded that plaintiff's seizures are "relatively infrequent" (R. 61), although he did not attempt to quantify the frequency or include this information in his hypothetical question to the VE except to restrict plaintiff from working around heights, dangerous machinery, flames, or water (R. 45). The ALJ acknowledged that the record documents "several" seizures and that plaintiff "has some ongoing seizure activity not fully controlled by Trileptal" (Tr. 61).[10] The ALJ cites Dr. Rentz's statement in April 2009 that plaintiff's "clinical episodes have been very infrequent" (R. 61, 292) but Dr. Rentz did not explain what he meant by "clinical episodes" and the ALJ did not explain his own understanding of this term. In the same month Dr. Rentz noted that plaintiff "says she believes she is having seizures as often as twice a month when she is under stress," and he gave no indication he doubted her (R. 295). On this record, there is no basis for the ALJ to find that plaintiff's seizure disorder is "fairly controlled" and to disregard Dr. Kohl's opinion that plaintiff's seizure disorder, along with her other impairments, prevents her from working.

Plaintiff's next objection is that the magistrate judge erred in concluding that no "sentence six" remand is warranted for the ALJ to consider new and material evidence. As noted

---

[10] Indeed, the record contains many references to plaintiff's seizures and shows she has been prescribed anticonvulsant medications for years. *See, e.g.,* R. 278, 295, 301 ("seizure on 2/3/08"), R. 447 (seizure on 8/26/07 and also one week earlier), R. 448 (noting on 8/26/07 "history of seizures on Trileptal"), R. 484 (two seizures on 10/12/07), R. 495 (noting on 10/13/07 "patient continues to have seizures at a frequency of approximately 1 to 2 per month on Trileptal"), R. 496 (noting on 10/13/07 "poor seizure control on her current dose of Trileptal" and increasing dosage to 450 mg twice per day), R. 520 (seizure on 6/2/07), R. 538 ("seizure-like activity" on 11/19/05), R. 546 (reviewing seizure history from 2000 to 2005), R. 706 (four seizures on 9/6/09, two of which occurred in a hospital emergency room), R. 710 (noting on 9/6/09 plaintiff has "known seizure disorder who had apparently seized and has been compliant with her medications which include Trileptal"), R. 715 (noting on 3/25/09 "seizure this evening").

above, this evidence consists of Dr. Mlak's psychiatric report dated June 24, 2010 (Ex. 30F, R. 750-55) and the occupational therapist's notes from April 2010 (Ex. 31F, R. 760-63). The court agrees that this evidence must be considered on remand as part of the process of correcting the errors identified both above and below. However, the remand will be pursuant to sentence four, not sentence six, of 42 U.S.C. § 405(g). *See Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171 (6th Cir. 1994).

        Two additional deficiencies in the ALJ's decision, which are not noted in plaintiff's objections, must also be corrected on remand. The first has to do with the side-effects of plaintiff's medications. Plaintiff testified that her medications have various side-effects, including causing sleepiness, and that between 9 AM and 5 PM she typically spends three to four hours in bed (R. 33-34). On her medication list, plaintiff indicated that three of her medications cause her to feel sleepy (R. 181), and the VE testified that no work exists for a person who needs to lie down for an hour per day (R. 47). In his decision, the ALJ entirely omitted any discussion of this side-effect which, according to the VE testimony and common sense, can be vocationally significant and even of disabling severity. The record indicates that plaintiff takes, or has taken, an extraordinary amount of medication, including Alprazolam (Xanax), Hydrocodone, Oxcarbazepine, Ranitidine, Trileptal, Xazen, Oxycodone-acetminophen (Percocet), Effexor, Catapres, Valium, Restoril, Zithromax, Ambien, Paroxetine (Paxil), Lorazepam (Ativan), Naprosyn, Seroquel, Zoloft, Duloxetine, and Benzodiazepine. *See* R. 181, 295, 298, 302, 386, 648-49, 681, 730, 738-39, 750, 752, 754. On remand, the ALJ must (1) determine which medications plaintiff is taking and has taken during the relevant time period, (2) quantify the extent to which, if at all, they cause plaintiff to feel drowsy/sleepy, and (3) incorporate these findings in a proper hypothetical question to the VE to

23

determine whether work exists in significant numbers that can be performed by a person experiencing such side-effects.

The second additional defect in the ALJ's decision is that is rests on a hypothetical question to the VE which entirely failed to incorporate all of plaintiff's mental and physical impairments. The ALJ's hypothetical question asked the VE to assume an

> individual with three years of college, but limited because of problems, psychological problems, to simple, unskilled, sedentary work; frequent fine finger manipulation and handling with the right dominant hand; no work at unprotected heights, around dangerous moving machinery, open flames, or bodies of water; no commercial driving.

(R. 45.) It was in response to this question that the VE identified 228,000 office clerk, hand packer and hand sorter jobs such a person could perform (Tr. 46). However, "[i]n order for a VE's testimony to constitute substantial evidence that a significant number of jobs exists, 'the question[s] must accurately portray a claimant's physical and mental impairments.'" *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011), *quoting Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). As indicated above, this hypothetical question fails to include any findings regarding (1) the extent to which plaintiff's headaches may require her to lie down during the day; (2) the extent to which the pain and loss of range of motion in plaintiff's right elbow, which was fractured in an automobile accident, affect her ability to use her right arm on a full-time basis; (3) the nature and extent of plaintiff's concentration and memory problems; (4) the nature and extent of plaintiff's PTSD; (5) the extent to which plaintiff's ability to use her right hand is limited by pain, weakness, numbness and arthritis; (6) the frequency and duration of plaintiff's seizures; and (7) the side-effects of her medications, particularly sleepiness and drowsiness. On remand, the ALJ must make these findings and include them in a properly formulated hypothetical question to the VE. The ALJ must also

24

consider whether the hypothetical question should include the need for a sit/stand option in light of the evidence indicating that plaintiff must change position frequently due to pain in her back caused by the compression fracture at T8.

"A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994), *citing Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). The present case comes very close to meeting this standard. Assuming plaintiff is not per se disabled under Listing 1.02, 12.04 or 12.06, which is doubtful, and assuming further that Dr. Kohl's opinion is not given controlling weight, it seems highly unlikely that the VE, in response to a properly framed hypothetical question, will testify to the existence of any jobs plaintiff can perform. He already indicated that no jobs exist, even at the simple, unskilled, sedentary level, if the hypothetical worker needs to be "off task" for 15 minutes per hour or to lie down for an hour per day due to pain, seizures, memory problems or medication side-effects (R. 46-47), and the evidence indicate that plaintiff has all of these impairments and, in addition, depression, anxiety, PTSD, and the limited use of her hands, particularly her right hand. Nonetheless, the court shall remand the matter for further proceedings rather than for an award of benefits so that the ALJ can make the necessary corrected factual findings in the first instance. Accordingly,

IT IS ORDERED that the magistrate judge's R&R is rejected.

IT IS FURTHER ORDERED that plaintiff's objections are sustained in part and

overruled in part as indicated above.

IT IS FURTHER ORDERED that defendant's motion for summary judgment is denied.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment is granted insofar as the matter is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings, including the consideration of Exhibits 30F and 31F, to correct the errors identified in this opinion.

_____
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

Dated:
        Detroit, Michigan

26